# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

JEFFREY PARKER, DONALD B. LOSEY,
and, SHELLEY WEATHERFORD,
individually and on behalf of themselves, the
GKN Group Retirement Savings Plan, and all
others similarly situated,

Civil Action No: _____

Plaintiffs,

v.

GKN NORTH AMERICA SERVICES, INC.,
BOARD OF DIRECTORS OF GKN NORTH
AMERICA SERVICES, INC., the BENEFIT
COMMITTEE, and John Does 1-30,

Defendants,

## CLASS ACTION COMPLAINT

## **<u>TABLE OF CONTENTS</u>**

I.    Introduction........................................................................................1

II.   Jurisdiction.........................................................................................6

III.  Parties...............................................................................................7

    A.    Plaintiffs...................................................................................7

    B.    Defendants ...............................................................................8

IV.   The Plan ..........................................................................................11

V.    Class Action Allegations .................................................................13

VI.   Defendants' Fiduciary Status and Overview of Fiduciary Duties...................15

VII.  Specific Allegations ........................................................................20

    A.    Improper Management of an Employee Retirement Plan Can Cost the
        Plan's Participants Millions in Savings ....................................20

    B.    Defendants Breached Their Fiduciary Duties by Failing to Investigate and
        Select Lower Cost Alternative Funds........................................26

    C.    Defendants Breached Their Fiduciary Duties by Retaining Imprudent Plan
        Investments ...............................................................................33

    D.    Defendants Breached Their Fiduciary Duties by Failing to Monitor or
        Control the Plan's Recordkeeping Expenses.............................38

VIII. Claims For Relief ............................................................................52

IX.   Prayer for Relief..............................................................................56

i

Plaintiffs Jeffrey Parker, Donald B. Losey, and Shelley Weatherford, on behalf of themselves, the GKN Group Retirement Savings Plan (the "Plan")[1], and all others similarly situated, allege the following:

## I.   **Introduction**

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, for breach of fiduciary duty against the Plan's fiduciaries, which include GKN North America Services, Inc. ("GKN"), the Board of Directors of GKN ("Board"), the Benefit Committee, and Jane and John Does 1-30 (collectively, "Defendants").

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. As of the end of 2020, Americans had approximately $9.6 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE ("ICI"), *Retirement Assets Total $34.9 Trillion in Fourth Quarter 2020* (Mar. 18, 2021).[2]

---

[1] The Plan is a legal entity that can sue and be sued. *See* the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to § 409, and the case law interpreting it, the relief sought in this action is for the benefit of the Plan, its participants and beneficiaries.

[2] Available at https://www.ici.org/node/836811 (last visited April 22, 2021).

3.     In 401(k) and other defined contribution plans, "participants' retirement benefits are limited to the value of their own individual investment accounts, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Thus, absent legal protections for employee-participants, the employer has limited incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investment are borne by the participants.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019), *cert. denied sub nom. Univ. of PA v. Sweda*, No. 19-784, 2020 WL 1496631 (U.S. Mar. 30, 2020); *see also Davis v. Magna Int'l of Am., Inc.*, No. 20-11060, 2021 WL 1212579, at *5 (E.D. Mich. Mar. 31, 2021) (denying motion to dismiss breach of fiduciary duty claims). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.     Defined contribution retirement plans are generally classified as "Micro" plans (<$5 million in assets), "Small" plans ($5 million-<$50 million),

"Mid" plans ($50 million-<$200 million), "Large" plans ($200 million-<$1 billion), and "Mega" plans (>$1 billion).

6.     As of December 31, 2018, the Plan had more than $820 million in net assets, and as of December 31, 2019, the Plan had more than $895 million in net assets.[3] Thus, the Plan's assets qualify it as a large plan.

7.     The Plan's assets are entrusted to the care of the Plan's fiduciaries. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

8.     Plaintiffs allege that Defendants, as Plan "fiduciaries," as the term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to the Plan, to Plaintiffs, and to the other participants and beneficiaries of the Plan in violation of § 404(a), 29 U.S.C. § 1104(a), by, among other things, (1) failing to review objectively and adequately the Plan's investment portfolio with due care to ensure that each investment option was prudent, particularly in terms of cost; and (2) maintaining certain funds as investment options in the Plan despite the

---

[3] GKN 2019 Form 5500 at 32.

availability of virtually identical or similar investment options with lower costs and/or better performance histories.

9.     Specifically, Defendants breached their fiduciary duties under ERISA by approving, maintaining, and recommending the "GoalMaker" asset allocation service furnished by Prudential Insurance Company ("Prudential"). Prudential touts GoalMaker as a service that "help[s] you keep your retirement goals on track" and "periodically rebalances your account to ensure that it matches your chosen GoalMaker portfolio."[4]

10.     However, these representations were false. Instead, GoalMaker served Prudential's interests by funneling participants' retirement savings into Prudential's own overpriced proprietary investment products and into investments that paid kickbacks to Prudential. GoalMaker disfavored the reliable, low-cost index funds in the Plan's investment menu available from reputable providers that did not pay kickbacks to Prudential. This resulted in the participants paying excessive investment management fees, administrative expenses, and other costs, which over the Class Period (as defined below) cost participants millions of dollars in retirement savings.

---

[4] Available at:
http://www3.prudential.com/email/retirement/IMFPWeb/hosted_documents/100512525-00005-00.pdf

11.     GKN could have easily stopped these abuses at any time by replacing the unreasonably high-fee, underperforming GoalMaker funds with reliable, low-fee Vanguard index funds already in the Plan's investment menu or with other less expensive target retirement date funds offered by numerous mutual fund families.

12.     Until 2020, GKN chose to retain GoalMaker and its menu of high-cost funds and ignored the conflicts of interest inherent in Prudential's asset allocation scheme, as well as the misrepresentations repeatedly made to participants. Defendants' belated replacement of GoalMaker did nothing to undo the adverse impact suffered prior thereto, as participants' retirement savings would have been substantially greater had Defendants removed and replaced GoalMaker at the outset of the Class Period.

13.     Defendants' actions were contrary to actions of a reasonable fiduciary, cost the Plan and its participants millions of dollars, and ran directly counter to ERISA's fiduciary duties of prudence and loyalty, undermining the purpose of 401(k) plans – *i.e.*, to maximize participants' retirement savings. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

14.     The Plan's GoalMaker investment options during the Class Period included:

- American Funds EuroPacific Growth R6;

5

- Prudential Core Bond CIT

- SSgA Real Asset CIT

- Prudential Large Cap Value / AJO Fund

- SA/T. Rowe Price Growth Stock Strategy

- Mid Cap Value Fund (sub-advised by Wellington Management)

- Prudential Mid Cap Growth / Artisan Partners Fund

- Guaranteed Income Fund

15.    Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence.

16.    This action seeks to recover the Plan's losses that Defendants are liable for under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiffs' claims apply to the Plan, which includes all participants with accounts invested in funds offered during the Class Period, Plaintiffs bring this suit on behalf of the Plan and as a class action on behalf of all participants and beneficiaries of the Plan during the proposed Class Period.

## II.    <u>Jurisdiction</u>

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

18.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

19.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   Parties

### A.   Plaintiffs

20.     Plaintiff Jeffrey Parker is a citizen and resident of Hartford, Wisconsin, and he is a participant in the Plan because he and his beneficiaries are eligible to receive benefits under the Plan. 29 U.S.C. § 1002(7).

21.     Plaintiff Donald B. Losey is a citizen and resident of Emporium, Pennsylvania, and he is a participant in the Plan because he and his beneficiaries are eligible to receive benefits under the Plan. 29 U.S.C. § 1002(7).

22.     Plaintiff Shelley Weatherford is a citizen and resident of Hickory, North Carolina, and she is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan. 29 U.S.C. § 1002(7).

23.     Upon information and belief, during the Class Period, Plaintiffs Losey, Parker, and Weatherford all participated in the GoalMaker asset allocation service.

## B.     **Defendants**

### **Plan Sponsor and Administrator Defendant**

24.     Defendant GKN North American Services, Inc. ("GKN") is a Delaware corporation headquartered in Auburn Hills, Michigan, and is engaged in the business of automotive components and supply. It is a holding company with subsidiaries throughout the United States.

25.     Defendant GKN is the Plan Sponsor and Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a). In this capacity, GKN has fiduciary responsibility for the Plan's investment options, investment allocation service, and administrative expenses.

### **Board Defendants**

26.     On information and belief, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

27.    Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.    On information and belief, the Board has discretion to authorize GKN to make decisions regarding the Plan's investment options, investment allocation service, and administrative expenses.

29.    The Board and unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Benefit Committee Defendants**

30.    On information and belief, GKN has delegated certain administrative and investment related duties to the Benefit Committee. The Benefit Committee and its members act as named fiduciaries of the Plan with respect to the control and management of the Plan, and they provide oversight of the investments, service providers, and objectives of the Plan.

31.    On information and belief, the Benefit Committee is responsible for the following Plan functions:

- Make asset classes/investment options with different risk/return profiles available under the Plan so that each Plan participant has the opportunity to prudently diversify Plan accounts, given investment circumstances.

- Establish and maintain investment policies and guidelines for the Plan.

- Ensure adequate controls are in place to account for all investment, recordkeeping, and administrative expenses associated with the Plan.

- Monitor investment options as to fund levels, returns, manager performance, and establish benchmarks.

- Remove investment options and/or managers not performing at acceptable levels.

- Avoid prohibited transactions or conflicts of interest.

- Appoint and remove the trustee for the Plan and the Plan's trust.

- Ensure that recordkeeping, administrative, investment management, and other Plan expenses are reasonable.

- Report to the Board.

32.    The Benefit Committee and unnamed members of the Benefit Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

33.    To the extent that there are additional officers and employees of GKN who are/were fiduciaries of the Plan during the Class Period, or were hired as an

investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 20-30 include, but are not limited to, GKN officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV. __The Plan__

34.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants that may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

35.     Prudential Retirement Insurance & Annuity Company ("Prudential Retirement") served as the recordkeeper for the Plan until 2019. Summary Plan Document dated January 1, 2013 (the "SPD") at 7. According to the SPD, the "Plan assets are held in and paid from a trust maintained by the Trustee," Prudential Bank & Trust, FSB. SPD at 3. Based on information and belief, Prudential also provided the investment platform for the Plan and the GoalMaker investment advisory service.

36. The Plan's original effective date was January 1, 2010. The Plan was amended and restated in its entirety with an effective date of January 1, 2012. Eligible employees of GKN and its subsidiaries are eligible to participate immediately following date of hire.

37. Participants can contribute between 1% and 50% of their eligible compensation to the Plan.

38. Employees are always 100% vested in their own contributions and are 100% vested in GKN's contributions after three years of service prior to January 1, 2014, and after two years of service after January 1, 2014. *See* 2018 Form 5500.

39. The fiduciary duties of GKN, the Board, and the Committee included selecting the investments for the Plan's investment menu. Participants who decided not to invest in GoalMaker could choose investment options for their individual accounts from the Plan's investment menu.

40. GKN, in providing Prudential's propriety asset allocation service GoalMaker, went beyond simply creating an investment menu. GoalMaker is a service that purports to make investments based on a participant's investment goals, using the investment options offered through the Plan, and periodically to rebalance those investments on an ongoing basis. Essentially, GoalMaker, through its asset allocation algorithms, purports to balance risk and reward in line with a participant's risk tolerance and years to retirement.

41.     An asset allocation program can be a benefit to participants – especially those with limited investment experience or time – in selecting a portfolio from a plan's investment menu.[5] However, such service must be prudently monitored by a fiduciary to ensure it has the participants' best interests in mind.

42.     GKN's provision of the investment menu and GoalMaker asset allocation service was made in a fiduciary capacity. GKN did not have the competence, exercise the diligence, or have in place a viable methodology to monitor the GoalMaker allocation service and investment options. GKN knew, or should have known, that GoalMaker was designed to steer participants' retirement savings to investment options that paid investment management fees and kickbacks to Prudential.

## V.     <u>Class Action Allegations</u>

43.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between October 19, 2015, and the present (the "Class Period").

---

[5] Available at: https://personal.vanguard.com/pdf/assessing-value-advice.pdf

44.    The members of the Class are so numerous that joinder of all members is impractical. According to the Form 5500 filed with the U.S. Department of Labor, as of January 1, 2019, there were 14,022 Plan participants.

45.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class Members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

46.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

C.    The proper form of equitable and injunctive relief; and

D.    The proper measure of monetary relief.

47.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class

action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.     This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.   **Defendants' Fiduciary Status and Overview of Fiduciary Duties**

50.     During the Class Period, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority

with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

51.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

52.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

      A.     they were so named; and/or

      B.     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.    they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.    they had discretionary authority or discretionary responsibility in the administration of the Plan.

54.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

55.    Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses.

56.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all

selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). *Accord Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002)

57.    "Thus, in deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment, ***when judged solely on the basis of its economic value to the plan***, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

58.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*,

No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011)

(quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir.

2007)).

59.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability

for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with respect
> to the same plan in the following circumstances: (A) if he participates
> knowingly in, or knowingly undertakes to conceal, an act or omission
> of such other fiduciary, knowing such an act or omission is a breach;
> (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C.
> §1104(a)(1), in the administration of his specific responsibilities which
> give rise to his status as a fiduciary, he has enabled such other fiduciary
> to commit a breach; or (C) if he has knowledge of a breach by such
> other fiduciary, unless he makes reasonable efforts under the
> circumstances to remedy the breach.

60.     During the Class Period, Defendants did not act in the best interests of

the Plan participants. Investment fund options chosen for a plan should not favor the

fund provider over the plan's participants. Yet here, to the detriment of the Plan and

its participants and beneficiaries, the Plan's fiduciaries provided and encouraged

participation in GoalMaker service and included and retained in the Plan many

mutual fund investments that were more expensive than necessary and otherwise

were not justified on the basis of their historical performance.

61.     Based on reasonable inferences from the facts set forth in this

Complaint, during the Class Period, Defendants failed to have a proper system of

review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options and for GoalMaker. Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

62.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VII.   <u>Specific Allegations</u>

### A.   <u>Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings</u>

63.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan and ensure the costs of these investments are reasonable. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

64.     The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third)

of Trust § 90, cmt. b). *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Aug. 2013) ("Look at Fees") ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").[6]

65.     This is because, as described by the Department of Labor, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years. *Id.*

66.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[7] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

67.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the

---

[6] Available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf

[7] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at:
https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income

level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *Look at Fees.*

68.     The duty to evaluate and monitor fees includes fees paid directly by Plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment. *See* ICI, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (August 2014), at 5. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 6.

69.     Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

70.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 10. ERISA-mandated monitoring of investments requires plan sponsors, provided they are responsive to their fiduciary obligations, to evaluate performance and fees continually, which has resulted in fierce competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans can result in economies of scale and special pricing within mutual funds. *Id*.

71.    This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fall 30 percent from 2000 to 2014 for equity funds, 24 percent for hybrid funds and 28 percent for bond funds. *Id*. at 1. *Id*. at 12.

72.    The trend has continued in subsequent years, and 401(k) plans on average pay significantly lower fees than regular industry investors, even as expense ratios for all investors have declined. *See* ICI, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2017*, at 11.[8] *See also* Ted Godbout, *"Here's How Much 401(k) Plan Mutual Fund Expenses Ratios Have Dropped*, ASPPA.org, March 5, 2020. (Available at https://www.asppa.org/news/here%E2%80%99s-how-much-401k-plan-mutual-fund-expense-ratios-have-dropped) ("The cost of investing in equity and hybrid mutual funds through 401(k) plan fell again in 2019, continuing a downward trend that has persisted for nearly 20 years.")

73.    Moreover, these figures come from industry surveys of public pricing and do not reflect the ability of large institutional investors such as the Plan to command lower-than-published pricing, due to the size of the investment they are making. Often, such investors have access to custom funds with the same or similar

---

[8] The notable exception to this is the money market funds, whose expense ratios rose after 2015. Because of the increased fees and the fact that investment in a money market fund does not increase materially in value, suffering the negative effects of inflation, many prudent fiduciaries removed money market funds from their Plans.

strategies as publicly available funds for the lowest-published price, or even a lower price, simply because of the economies of scale that come with the ability to invest hundreds of millions of dollars in a single fund.

74.     Prudent plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

75.     This is especially critical because while higher-cost mutual funds may outperform a less-expensive option (such as a passively-managed index fund) over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year). Conversely, mutual funds with the worst performance tend to continue to perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst    Performing    Mutual    Funds*,    at    6    (2004)    available    at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf (attributing continuing poor mutual fund performance to less responsive

investors who do not pull their capital from the funds, which could cause the fund manager to change strategies).

76.    As a result, plan fiduciaries such as Defendants here must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

77.    Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan which include a remittance of a fee to the Plan sponsor, administrator, or investment advisor, or another party otherwise affiliated with the Plan sponsor. The inherent conflict of interest in such situations can cause affiliated funds to be selected and retained when they are not the most prudent investment option and when they demonstrate poor performance.

78.    In fact, one Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans," especially for the worst performing funds. *See* Veronika Pool, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund Investment Options in 401(k) Plans*, at 2 (May 2015). Moreover, even though plan participants may be aware of the affiliation, due to their naivety in

investments and general inactivity in changing those investments, the study found "participants are not generally sensitive to poor performance and thus they do not undo the trustee bias." *Id*. at 3.

79.     "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year," and thus, "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id*. at 3, 26.

80.     Given the vulnerability of plan participants, who are dependent on the retirement income earned by their plan investment choices, plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated funds in their 401(k) plans.

**B.      Defendants Breached Their Fiduciary Duties by Failing to Investigate and Select Lower Cost Alternative Funds**

81.     The Supreme Court has reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court

referenced with approval the Uniform Prudent Investor Act (the "UPIA"), treatises, and seminal decisions confirming the duty.

82.     The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

83.     Under trust law, one of the responsibilities of a plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident." *Comau LLC v. Blue Cross Blue Shield of Michigan*, 2020 WL 7024683, at *7 (E.D. Mich. Nov. 30, 2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013)).

84.    The Plan retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, shown in the tables below, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

85.    During the Class Period, the Plan lost millions of dollars by offering high-priced investment options instead of other funds that were materially less expensive and had similar features and investment approaches.

86.    Using services that are readily available to ERISA fiduciaries to analyze the current Plan offerings, as reported in the Form 5500 for the year ended December 31, 2018, seven of the funds in the Plan – including six GoalMaker funds – were significantly more expensive than comparable funds found in similarly-sized plans (*i.e.*, plans having $500 million to $1 billion in assets). As shown in the table below, the expense ratios for funds in the Plan in one case is as much as **127%** greater than the expense ratio for comparable funds available to the Plan. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study").[9]

87.    The table below provides a comparison of the imprudent GoalMaker funds along with substantially similar funds that employ the same investment

_____

[9] *See* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf.

strategies, but currently have significantly lower net expense ratios. The chart uses data current as of September 21, 2021, to ensure a direct comparison of the funds:

| Current Fund Option | Net Expense Ratio | 1 yr. Return (%) | 3 yr. Return (%) | 5 yr. Return (%) | Similar Funds With Lower Fee | Net Expense Ratio | 1 yr. Return (%) | 3 yr. Return (%) | 5 yr. Return (%) |
|---|---|---|---|---|---|---|---|---|---|
| RERGX | | | | | VWILX Vanguard International Growth Adm | 0.33% | 29.12% | 23.14% | 21.40% |
| $106,572,585 | 0.46% | 26.31% | 13.86% | 12.80% | FVWSX Fidelity Series Opportunistic Insights Fund | 0.27% | 30.72% | 19.11% | 21.15% |
| American Funds Europacific Growth R6 | | | | | VWIGX Vanguard International Growth Fund | 0.44% | 28.97% | 23.00% | 21.26% |
| Benchmark: MSCI ACWI Ex USA Growth NR USD | N/A | 24.66% | 8.66% | 10.04% | SSPGX State Street Institutional Premier Growth Equity Fund | 0.42% | 32.55% | 22.89% | 21.99% |

29

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| RXPF00616<br><br>$76,512,479<br><br>Prudential Large Capital Value / AJO Fund | 1.12% | Unavailable | 9.13% | 4.93% | VWNAX<br>Vanguard Windsor II Admiral | 0.26% | 40.09% | 14.45% | 15.11% |
| | | | | | SFLNX<br>Schwab Fundamental US Large Company Index Fund | 0.25% | 39.89% | 12.94% | 14.59% |
| | | | | | GMUEX<br>GMO US Equity III | 0.46% | 37.67% | 14.23% | 14.97% |
| Benchmark: Russell 1000 Value TR USD | N/A | Unavailable | 10.19% | 7.46% | NOLCX<br>Northern Large Cap Core | 0.46% | 36.52% | 13.56% | 15.30% |
| RXPF00617<br><br>$53,826,075<br><br>Prudential Mid Cap Growth / Artisan Partners Fund | 1.21% | Unavailable | 16.55% | 10.24% | DBMYX<br>BNY Mellon Sm/Md Cap Growth Fund | 0.64% | 30.71% | 23.65% | 25.17% |
| | | | | | VMGIX<br>Vanguard Mid-Cap Growth Index Fund | 0.19% | 38.74% | 19.91% | 19.10% |
| | | | | | VMGRX<br>Vanguard Mid-Cap Growth Fund | 0.36% | 35.69% | 17.21% | 18.90% |
| Benchmark: Russell Mid Cap Growth TR USD | N/A | Unavailable | 16.49% | 11.10% | BMGKX<br>BlackRock Mid-Cap Growth Equity K | 0.70% | 45.08% | 24.30% | 25.98% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| RXPF02538<br><br>$45,508,954<br><br>Prudential Mid Cap Value / Wellington Management Fund | 1.17% | Unavailable | 7.82% | 4.35% | FMEIX<br><br>Fidelity Mid Cap Enhanced Index | 0.59% | 40.48% | 13.14% | 14.14% |
| | | | | | NOMIX<br><br>Northern Mid Cap Index | 0.15% | 42.86% | 10.37% | 13.13% |
| | | | | | VIMSX<br><br>Vanguard Mid Cap Index Fund | 0.17% | 38.48% | 14.60% | 15.18% |
| Benchmark: Russell Mid Cap Value TR USD | N/A | Unavailable | 8.95% | 6.72% | JNVIX<br><br>Jensen Quality Value I | 0.82% | 35.15% | 13.67% | 12.14% |
| RXPF00947<br><br>$17,430,109<br><br>Prudential Balanced I Fund / Wellington Management | 0.97% | Unavailable | 8.37% | 5.67% | RBAIX<br><br>T. Rowe Price Balanced I | 0.42% | 21.07% | 11.81% | 11.70% |
| | | | | | VWELX<br><br>Vanguard Wellington Fund | 0.24% | 22.18% | 12.21% | 12.00% |
| | | | | | DODBX<br><br>Dodge & Cox Balanced Fund | 0.53% | 28.83% | 10.31% | 11.42% |
| Benchmark: Morningstar Mod Tgt Risk TR USD | N/A | Unavailable | 9.26% | 6.56% | VWENX<br><br>Vanguard Wellington Admiral | 0.16% | 22.27% | 12.30% | 12.09% |

88.     As shown above, the expense ratios of Plan funds listed above are significantly higher than those for comparators. Further, the performance of the Plan funds above has generally failed to match that of the comparators, which have substantially similar investment strategies and underlying assets. Accordingly, there are many equivalent investments that would cost participants far less than, and perform at least as well as, the funds selected for the Plan by Defendants.

89.     The chart above demonstrates that the expense ratios of certain of the the Plan's investment options, specifically the GoalMaker options, were higher by multiples than comparable alternative funds in the same investment style. A reasonable investigation by the Plan's fiduciaries would have revealed the existence of these lower-cost alternatives. The comparison above in some cases underestimate the excessiveness of the investment management fees for the Plan's funds, because only some of the comparator funds in the comparison above are index funds. Defendants selected numerous underperforming and unreasonably expensive *actively* managed funds, when substantially less expensive *passively* managed index funds would have resulted in superior long-term performance by comparison to the exact same benchmarks used to evaluate the performance of the Plan's fund offerings.

**C.**    **Defendants Breached Their Fiduciary Duties by Retaining Imprudent Plan Investments**

90.    Defendants failed to conduct appropriate due diligence in selecting and retaining numerous imprudent Plan investments, including failing to investigate lower-cost alternatives that were available to the Plan and could have been selected as Plan investment options.

91.    Prudent fiduciaries of large defined contribution plans must regularly analyze the Plan's investment options to determine whether its actively managed funds will outperform their benchmarks, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest for the Plan to continue to offer a particular actively managed option for the particular investment style and asset class.

92.    Defendants failed to undertake such analysis when they selected and retained the actively managed funds in the chart above at paragraph 87. Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

93.    Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds in the chart above generally underperformed their respective fund categories' benchmarks over extended periods.

33

94.    Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds above would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or if instead the reason for the poor performance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

95.    An appropriate comparison for GoalMaker is a target date fund investment. Target retirement date funds, also referred to as life-cycle funds or age-based funds, are a series of funds structured to grow assets within a set time frame defined by the participant's expected retirement year. Target retirement funds are designed to be the only investment vehicle that an investor uses to save for retirement.

96.    A target-date fund operates under an asset allocation formula that assumes a participant will retire in a certain year and adjusts its asset allocation model as it gets closer to that year. The target year is identified in the name of the fund. So, for instance, if a participant plans to retire in or near 2045, he or she would pick the fund in the series with 2045 in its name. The marketplace for target date

funds includes funds that utilize low-cost, passive management strategies, as well as funds that employ active management strategies.

97.    When compared to the Fidelity Institutional Asset Management ("FIAM") target date funds, and ensuring the investments are weighted to match fund characteristics, GoalMaker's fees are demonstrably higher. Prudential claims that to "keep your retirement goals on track, GoalMaker periodically rebalances your account to ensure that it matches the allocations of your chosen GoalMaker model portfolio."[10] In other words, GoalMaker emulates a series of target retirement date funds by using GoalMaker's proprietary algorithms to allocate a participant's savings among the funds in the Plan's GoalMaker investment menu. GoalMaker periodically rebalances this asset allocation in the same manner as a target retirement date fund. However, GoalMaker's investment menu is almost entirely high expense ratio actively managed funds, which makes this approach far more expensive than a target-date fund.

98.    The below chart compares the GoalMaker ("GM") fees and estimated alternative fees – here fees for comparable FIAM funds – for each year in the Class Period, including the fee differential, reinvestment rate, and reinvestment fee differential:

---

[10] *See* Goalmaker: Asset Allocation Strategies | Prudential Financial (last visited Sept. 1, 2021).

| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| GM Fees at Fund Wtd. Avg. Rate | $2,435,741 | $2,511,075 | $2,705,547 | $3,206,371 | $2,954,263 | $13,812,996 |
| Estimated Alternative Fees (FIAM)[11] | $1,145,304 | $1,173,630 | $1,250,550 | $1,480,911 | $1,359,775 | $6,410,171 |
| | | | | | | |
| Fee Differential | $1,290,437 | $1,337,444 | $1,454,997 | $1,725,459 | $1,594,488 | $7,402,825 |
| Reinvestment rate (GM) | | 0.73% | 4.58% | 19.56% | -7.29% | |
| Reinvested fee differential (GM) | $1,506,974 | $1,550,521 | $1,612,856 | $1,599,757 | $1,594,488 | $7,864,596 |
| | | | | | | |
| Fee Differential | $1,290,437 | $1,337,444 | $1,454,997 | $1,725,459 | $1,594,488 | $7,402,825 |
| Reinvestment rate (FIAM)[12] | | -0.38% | 8.34% | 18.19% | -6.54% | |
| Reinvested (FIAM) | $1,538,412 | $1,600,583 | $1,607,221 | $1,612,698 | $1,594,488 | $7,953,402 |

99.   The below chart compares GoalMaker investment value and fees to those of FIAM:

| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| GM Invested Dollar Value[13] | $440,501,676 | $451,396,275 | $480,980,765 | $569,581,250 | $522,990,313 | |
| GM Weighted Average Fees | 0.55% | 0.56% | 0.56% | 0.56% | 0.56% | |
| GM Weighted Average Returns | 3.95% | 0.73% | 4.58% | 19.56% | -7.29% | |
| Calculated Gross Returns | 4.51% | 1.29% | 5.15% | 20.12% | -6.72% | |
| | | | | | | |
| FIAM Weighted Average Fees[14] | 0.26% | 0.26% | 0.26% | 0.26% | 0.26% | |
| FIAM Weighted Average Returns[15] | 6.62% | -0.38% | 8.34% | 18.19% | -6.54% | |
| Calculated Gross Returns | 6.88% | -0.12% | 8.60% | 18.45% | -6.28% | |
| | | | | | | |
| Gross Return Differential | 2.37% | -1.41% | 3.45% | -1.68% | 0.45% | |
| Cumulative Gross Return Differential | 2.37% | 0.90% | 4.63% | 3.61% | 3.98% | |

---

[11] Assumes FIAM fees unchanged from 2019.

[12] Assumes FIAM weightings unchanged from 2019.

[13] Excludes Guaranteed Income Fund.

[14] Assumes FIAM fees unchanged from 2019.

[15] Assumes FIAM weightings unchanged from 2019.

| Potential Performance Losses | $3,211,631 | $9,799,707 | -$5,959,387 | $2,535,229 | $0.00 | **$9,587,181** |
| --- | --- | --- | --- | --- | --- | --- |

100.   Accordingly, when compared to an appropriate alternative investment, GoalMaker's fees were clearly excessive, constituting an imprudent investment option.

101.   In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 575 U.S. 523. In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the GoalMaker funds, and they continued to retain these funds despite their continuing underperformance compared to their benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plan for each of these investments.

102.   Prudent fiduciaries of defined contribution plans must continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the GoalMaker funds should have been removed from the Plan prior to 2020.

103.   Had the Defendants removed these funds from the Plan prior to 2020, as a result of which the amounts would have been invested in any of the lower-cost

alternatives identified herein, participants in the Plan would not have lost millions of dollars' worth of their retirement savings.

**D.    Defendants Breached Their Fiduciary Duties by Failing to Monitor or Control the Plan's Recordkeeping Expenses**

104.   Recordkeeping services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, and participant communications. At all times during the Class Period, Defendants received a standard package of recordkeeping services.

105.   Third-party service providers, often known as "recordkeepers," provide recordkeeping services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services, and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

106.   The market for defined contribution recordkeeping services is highly competitive, particularly for a plan, like the Plan, with large numbers of participants and large amounts of assets.

107.   Since at least the mid-2000s, the fee that service providers have been willing to accept for providing recordkeeping services has decreased.

108.   The underlying cost to a recordkeeper of providing recordkeeping services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

109.   The incremental cost for a recordkeeper to provide recordkeeping services for a participant's account does not materially differ from one participant to another; it is generally not dependent on the balance of the participant's account.

110.   Recordkeepers for relatively larger defined contribution plans, like the Plan, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases, because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participants base, thereby reducing the unit cost of delivering services on a per-participant basis.

111.   Therefore, while the total cost to a provider for recordkeeping services increases as more participants join the Plan, the cost per participant to deliver the services decreases. Since at least the early 2000s, plan fiduciaries, including Defendants, along with their consultants and advisors, have been aware or should have been aware of this cost structure dynamic for recordkeeping providers.

112.    Sponsors of defined contribution plans often contract for recordkeeping services separately from any contracts related to the provision of investment services or options to plan participants.

113.    Recordkeeping service providers often make separate contractual arrangements with investment providers. For example, recordkeeping providers often collect a portion of the total expense ratio fee of the mutual fund. This is known as "revenue sharing."

114.    However, a recordkeeping provider receives its compensation, whether through direct payments, indirect compensation such revenue sharing, or a combination of both, the plan fiduciaries must ensure that the that the total compensation received by the provider is reasonable for the services provided. In order to determine reasonability, plan fiduciaries must understand the total dollar amounts being paid to the recordkeeper as well as understanding the marketplace rates for the recordkeeping services received by the Plan.

115.    The fees paid to recordkeepers should be evaluated and compared by the plan fiduciaries on a dollar per participant basis, because the compensation can come from multiple sources, as described above.

116.    A plan with more participants can and should receive a lower effective per participant fee than a smaller plan. This is well-known among retirement plan professionals, including service providers.

117.    Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping services by soliciting competitive bids from several service providers to perform the same services currently being provided to the Plan. This is not a difficult or complex process, and prudent plan fiduciaries perform it regularly. Plan fiduciaries need only request a bid, a request for proposal ("RFP"), from salespeople at other service providers. For plans with as many participants as the Plan, most recordkeepers would require only the number of participants to provide a quote. At all times, plan fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

118.    By going through an RPF process every few years, the prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

119.    Plan fiduciaries also decide how to pay the negotiated fee for recordkeeping services. While the employer or the plan sponsor can pay the recordkeeping fee on behalf of participants, most choose instead to pass on the fee to Plan participants. When the recordkeeping fee is paid by plan participants, the

plan fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

120. In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation, as well as additional contributions to the plan, the revenue received by the recordkeeper increases. This structure is preferred by recordkeepers, because it allows the recordkeeper to obtain an increase in revenue without having to ask the client to take affirmative steps to pay a higher fee, and without the recordkeeper having to do additional work.

121. Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fee paid to the recordkeeper is reasonable for the level of services provided.

122. Fiduciary best practices, based on DOL guidelines, case law, and marketplace experience, are known or should be known to Defendants. These practices are:

- Price administrative fees on a per-participant basis.

- Benchmark and negotiate recordkeeping and investment fees separately.

- Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

- Benchmark and negotiate recordkeeping fees at least every other year.

- Review services annually to identify opportunities to reduce administrative costs.[16]

123. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

124. First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the Plan. A prudent fiduciary tracks fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

---

[16] "Fiduciary Best Practices," *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

125.   Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

126.   Third, a plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, particularly comparably sized plans, as well as the recordkeeping rates that are or may be available to the plan. This will generally include conducting an RFP process at reasonable intervals, and immediately upon discovery that a plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three (3) years as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if every-other-year fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

127.   By merely soliciting bids from other providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar recordkeeping services and have an idea of a starting point for negotiation. Accordingly, the only way to determine the true market price at any given time is to obtain competitive bids through some process. *See Kraft Foods*, 641 F.3d at 800 (7th Cir. 2011) (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

128.   A plan fiduciary must continuously monitor its recordkeeping fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

129.   During the Class Period, Defendants knew or should have known that a plan with more participants, such as the Plan, can receive a lower effective per participant fee when evaluated on a per participant basis. Defendant also knew or should have known that the Plan should have received lower effective per participant fees than were actually paid.

130.   During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's recordkeeping fees paid to covered service providers, including but not limited to Northwest.

131.   During the Class Period, upon information and belief, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to covered service providers.

132.   During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, in order to avoid paying objectively unreasonable fees for recordkeeping services.

133.   During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's participants to ensure that the Plan paid no more than a competitive and reasonable fee for the recordkeeping services.

134.   During the Class Period, and unlike a prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services.

135.   During the Class Period, and unlike a prudent fiduciary, Defendants did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services. Alternatively, to the extent there was a process in place that Defendants followed, they acted ineffectively, given the objectively unreasonable fees paid for recordkeeping services.

136.   During the Class Period, and unlike a prudent fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for recordkeeping services.

137.   Upon information and belief, during the Class Period and because Defendants failed to regularly monitor the Plan's recordkeeping fees paid to covered service providers the Plan's recordkeeping service fees were significantly higher than they would have been had Defendants engaged in this process.

138.   During the Class Period, because Defendants did not regularly solicit quotes and/or competitive bids from covered service providers, the Plan's recordkeeping service fees were significantly higher than they would have been had Defendants engaged in these processes. Alternatively, to the extent there was a process in place that Defendants followed, Defendants acted ineffectively, given the objectively unreasonable fees paid for recordkeeping services.

139.   During the Class Period, because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for recordkeeping services to covered service providers, these recordkeeping service fees were significantly higher than they would have been had Defendants engaged in these efforts.

140.   Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.

Based on the information available to Plaintiffs, Defendants permitted the Plan to pay its recordkeeper, Prudential Retirement, the following per participant recordkeeping and other administrative costs during the Class Period:

| Year | No. of Participants[17] | Recordkeeping Costs | P/P Cost |
|------|------------------------|---------------------|----------|
| 2013 | 10,908 | $787,624 | $72.21 |
| 2014 | 11,878 | $945,147 | $79.57 |
| 2015 | 12,452 | $1,066,100 | $85.62 |
| 2016 | 13,326 | $871,452 | $65.39 |
| 2017 | 13,831 | $1,197,155 | $86.56 |
| 2018 | 13,871 | $1,302,241 | $93.88 |

141. The per participant recordkeeping fees averaged **$80.54** during the Class Period.

142. From the years 2013 through 2018, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, it was possible for the Plan to negotiate recordkeeping fees for not more than between $20 and $35 per participant. The table below illustrates that the annual recordkeeping fees to recordkeepers by comparable plans of similar sizes of assets under management in 2018, compared to the average annual recordkeeping fees paid by the Plan (as identified in the table above). Even

---

[17] All information in this chart is based on Form 5500 information filed by Plan for each respective year.

in the year the Plan paid the least on a per participant basis, or $65.39 per participant, the Plan's recordkeeping fees were much higher than the fees paid by other Plans.

| Comparable Plans' RK&A Fees from Recordkeepers in 2018[18] | | | | | |
|---|---|---|---|---|---|
| Plan | Participants | Net Assets | Recordkeeping Fees | Per Participant Fee | Recordkeeper |
| GKN Group Retirement Savings Plan | **13,871** | **$820,792,320** | **$1,302,241** | **$94** | Prudential Retirement |
| Sutter Health Retirement Income Plan | 13,248 | $448,119,989 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,603,610,831 | $472,673 | $35 | Fidelity |
| The Tax Sheltered Annity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |
| Dollar General Corp. 401(k) Savings and Retirement Plan | 19,118 | $355,768,325 | $349,756 | $18 | Voya |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $930,019 | $30 | Alight Financial |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard |
| Sutter Health 403(B) Savings Plan | 73,358 | $3,681,162,013 | $1,908,133 | $26 | Fidelity |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,434,851 | $17 | Vanguard |

---

[18] Price calculations are based on Form 5500 information filed by the respective plans for the year 2018, if available or more recent year if not available.

143.   The information above also illustrates that even to the extent the Plan fiduciaries did undertake a review of the Plan's recordkeeping expenses, the process they used to evaluate fees was so deeply flawed that Plan participants continued to pay between *2 to 4 times* what they should have been for substantially similar recordkeeping services.

144.   From the years 2013 through 2018, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, had Defendants been acting in the exclusive best interest of the Plan and/or employed a robust process to gather appropriate information and evaluate recordkeeping fees and services, the Plan would have paid significantly less than an average of $1,028,287 per year in recordkeeping fees, or approximately $80.54 per participant.

145.   If Defendants had been acting in the exclusive best interest of the Plan and/or employed a robust process to gather appropriate information and evaluate recordkeeping fees and services, the Plan would have paid between $20-$35 per participant per year during the Class Period for recordkeeping services.

146.   During the entirety of the Class Period, unlike prudent fiduciaries, Defendants did not regularly and/or reasonably assess the recordkeeping fees the Plan paid its recordkeepers, and did not engage in regular and/or reasonable

examination and competitive comparisons of the fees paid its recordkeepers *vis-à-vis* the fees that other recordkeeping providers would charge for the same services.

147.   During the entirety of the Class Period, Defendants knew or had knowledge that they must engage in regular and/or reasonable examination and competitive comparison of the Plan's recordkeeping fees, but discovery will show Defendants simply failed to do so.

148.   Had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the recordkeeping fees the Plan paid, they would have realized that the Plan was compensating the recordkeepers unreasonably and inappropriately for the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan Participants.  The fees were also excessive relative to the recordkeeping services received.

149.   During the entirety of the Class Period, by failing to recognize that the Plan and its participants were being charged much higher recordkeeping fees than they should have been charged and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiffs and the Plan Participants.

## VIII.  Claims For Relief

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against GKN and Committee Defendants)

150.  Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

151.  At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

152.  As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

153.  Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants selected and retained

investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

154.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

155.  Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

156.  Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against GKN and the Board Defendants)

157.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

158.   GKN and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

159.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

160.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to GKN and the Board Defendants.

161.   GKN and the Board Defendants breached their fiduciary monitoring duties by, among other things:

A.   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

B.   failing to monitor the processes by which Plan investments were evaluated, and failing to investigate the availability of lower-cost separate account and collective trust vehicles; and

C.   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

162.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had GKN and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

163.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), GKN and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## IX.    **Prayer for Relief**

164.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2).

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties to the participants;

D.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

E.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants

made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

F. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

G. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

H. An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the proprietary funds maintained by the Plan in proportion to the accounts' losses attributable to excessive fees and underperformance of the proprietary investments;

I. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J. An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K. An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated: October 19, 2021

By: */s/ David H. Fink*
David H. Fink (P28235)
Nathan J. Fink (P75185)
FINK BRESSACK
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI 48304
Phone: (248) 971-2500
Fax: (248) 971-2600
dfink@finkbressack.com
nfink@finkbressack.com

Eric Lechtzin (Fed. Bar I.D. # 62096PA)
Marc H. Edelson (PA - 51834)
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com
medelson@edelson-law.com

Todd Collins
Natalie Lesser
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
tcollins@bm.net
nlesser@bm.net